IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| **ALTOR BIOSCIENCE, LLC, and NANTCELL, INC.,**<br><br>      **Plaintiffs,**<br><br>**vs.**<br><br>**HCW BIOLOGICS, INC.,**<br><br>      **Defendant.** | Case No.:<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Altor BioScience, LLC ("Altor") and NantCell, Inc. ("NantCell") ("Plaintiffs"), by way of their Complaint against defendant HCW Biologics, Inc. ("HCW Biologics"), allege as follows:

## NATURE OF THE ACTION

1.      This action is brought by Altor BioScience, LLC,[1] and NantCell, Inc., companies invested in immunotherapy and small molecule cancer research and development.  Altor and NantCell seek to recover technology stolen by former Altor and NantCell CEO, Dr. Hing C. Wong ("Dr. Wong"), and HCW Biologics, a company (bearing his initials) that Dr. Wong surreptitiously created while he was Plaintiffs' CEO.  After leaving Plaintiffs in 2018 as an employee, but while still acting as an Altor consultant, Dr. Wong helped HCW Biologics develop technologies that improperly piggyback on the proprietary research Dr. Wong and others had done at Altor and that Dr. Wong stole on his way out the door.

---

[1]    Altor BioScience Corporation merged with a subsidiary of NantCell to become Altor BioScience, LLC on July 31, 2017.  The term "Altor" is used to refer to both entities.

2.      By 2018, Altor had built a massive portfolio of viable molecule candidates and proprietary technologies and ideas for the treatment of various cancers.  One of the breakthroughs at Altor involved the construction of highly efficacious molecules made by fusing different protein components that together could identify and engage different cancer targets at the same time with extraordinary specificity.  Just as importantly, Altor, through its research and development, determined which molecular candidates and proteins would not be efficacious.

3.      Even though he had signed several agreements requiring him to maintain the confidentiality of Altor's proprietary information and to use Altor's research only for the benefit of Altor, Dr. Wong stole confidential and trade secret research he and other Altor scientists had assembled.  The stolen research related to how particular proteins (discussed in greater detail below) known as "TGF-β receptor II," "interleukin-12, 18, and 15" (and their derivatives), and "tissue factor" function, how they can physically be combined into a fusion protein complex, how they chemically and biologically act in concert, and how the fusion protein complex can be evaluated for the treatment of certain cancers.  Dr. Wong recognized the distinct advantage that Altor's research would provide in the launch of his new business and could not resist using his position and his access to Altor resources to reap the benefits of Altor's labor for the benefit of HCW Biologics, which HCW Biologics accepted and exploited.

4.      Knowing that he could not quickly start a new competing business without Altor's foundational technology, in his final weeks as CEO of Altor in 2018, Dr. Wong sought permission to purchase certain Altor resources.  Altor repeatedly and emphatically refused to agree to this request.  Instead, Altor agreed only to assign Dr. Wong the lease for one of Altor's buildings following Dr. Wong's repeated assurances that his new company would work on anti-aging products and not compete with Plaintiffs in developing new cancer treatments.

5.      But Altor's refusal to agree to his requests to purchase Altor resources did not stop Dr. Wong from secretly taking the very technology he unsuccessfully had sought to purchase, or from integrating it into HCW Biologics' research.  For example, beginning in the months before his departure as CEO of Altor in March 2018, Dr. Wong engaged in a covert

2

effort to misappropriate confidential information by moving that information from Altor servers to private accounts and devices.  Among other things, as Dr. Wong was preparing to leave Altor as an employee, he accessed and downloaded en masse internal records of Altor's molecules, including information about the status of their development and results on how the components of those molecules performed in extensive testing.  Dr. Wong put the downloaded records onto removable drives that were not returned to Altor.  Ultimately, several of Altor's molecular components and technologies became core pieces of the "new" molecules "developed" at HCW Biologics.

6.      Before agreeing to become a consultant for Altor, and while he was still an employee, Dr. Wong also strategically exploited Altor's personnel and resources to gather Altor's confidential research on particular molecule components that were of interest to himself and his new company.  This included forming a focus group at Altor specifically devoted to studying a molecule called "tissue factor" that would later serve as the foundation for key molecules developed by HCW Biologics.

7.      Dr. Wong's misappropriation, failure to disclose and assign inventions, and usurpation of corporate opportunities did not become apparent until numerous provisional patent applications, which he filed beginning just weeks after he left Altor as an officer and while he still was under contract as an Altor consultant, became publicly available in 2020.  The patent applications listed Dr. Wong as sole "inventor" and assigned the "inventions" to HCW Biologics.  The provisional applications claim HCW Biologics technologies developed at Altor, including those that Dr. Wong had unsuccessfully attempted to purchase from Altor.

8.      These patent applications could not have been prepared by HCW Biologics and Dr. Wong in such a short time without using Altor proprietary information.  Under Dr. Wong's various agreements with Altor, the inventions claimed in the patent applications belong to Altor.  Still today, many of the products in HCW Biologics' product pipeline incorporate, mimic, or are based on technologies that Dr. Wong helped to develop—and in some cases had concealed—while an officer of Altor.

3

9.      This action asserts Altor's claims relating to its confidential and proprietary technology that Dr. Wong improperly took with him to form HCW Biologics when he was an Altor officer, and that Dr. Wong continued to misappropriate while he was a consultant for Altor. HCW Biologics induced Dr. Wong to breach several of Dr. Wong's agreements with Altor, encouraging him to take Altor information and then using it to build critical functionality and know-how into HCW Biologics for Dr. Wong's and HCW Biologics' benefit.  And as CEO and President of Altor, Dr. Wong breached his fiduciary duties under Florida law, and failed to disclose and assign, for HCW Biologics' benefit, inventions and ideas developed while at Altor. Dr. Wong's massive theft of Altor technology is irreparably harming Plaintiffs, depriving them of what is rightfully theirs and hurting Plaintiffs in the marketplace.

10.     Now that Dr. Wong's and HCW Biologics' theft of Altor's technology and breaches of Dr. Wong's contracts have been discovered, Altor and NantCell will be able to show that they have suffered at least tens of millions of dollars in damages.  The stolen technology has also brought substantial unjust enrichment to HCW Biologics.

11.     In an effort to conceal his wrongdoing, Dr. Wong lied to NantCell's founder, Dr. Patrick Soon-Shiong ("Dr. Soon-Shiong") and others at Altor and NantCell about the work HCW Biologics was doing.  Dr. Wong both attempted to conceal and deceive Plaintiffs about HCW Biologics' line of business and what technologies Dr. Wong and HCW Biologics were using. Instead of admitting that he and HCW Biologics were developing cancer drugs that would compete with Altor, Dr. Wong instead provided Plaintiffs false reassurances that HCW Biologics was working on only diabetes and fibrosis drugs, and that HCW Biologics would not be working to develop cancer drugs.  But it is now clear that Dr. Wong was lying, and that he and HCW Biologics were developing competing cancer drugs.

12.     In addition to causing harm to Altor and NantCell, Dr. Wong and HCW Biologics were unjustly enriched by their improper use of Altor's misappropriated technologies.  First, HCW Biologics obtained tens of millions in private investment, and then it made an initial public

offering of HCW Biologics stock that raised over $50 million.  Altor requests that it be awarded damages and other relief on its claims as set forth below.

## PARTIES

13.     Plaintiff Altor BioScience, LLC is a Delaware LLC with its principal place of business in Culver City, California.  Altor BioScience, LLC is the successor in interest to Altor BioScience Corporation.

14.     Plaintiff NantCell, Inc. is a Delaware corporation with its principal place of business in Culver City, California.

15.     Defendant HCW Biologics, Inc. is a Delaware corporation with its principal place of business at 2929 N. Commerce Parkway, Miramar, Florida 33025.

## JURISDICTION AND VENUE

16.     This is an action for injunctive relief and damages wherein the value of the matter in controversy exceeds $150,000, exclusive of attorneys' fees, costs, and interest.

17.     Jurisdiction and venue are proper in Broward County because HCW Biologics has its principal place of business in Miramar, Florida; upon information and belief, HCW Biologics maintains an office in Miramar, Florida, has employees in that office, and regularly conducts business in that office, and additionally because one or more causes of action accrued in this district.

18.     This Court has subject-matter jurisdiction over Plaintiffs' claims for Defendant's violations of the Defend Trade Secrets Act ("DTSA").  *See* 18 U.S.C. § 1836 ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."); *M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016) ("[DTSA] conferred on U.S. district courts subject matter jurisdiction over civil actions pertaining to the theft of trade secrets used in interstate or foreign commerce.").

19.     This Court has supplemental jurisdiction over Plaintiffs' remaining claims.  28 U.S.C. 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

20.     This Court also has personal jurisdiction over HCW Biologics because it is a citizen of Florida; "[o]perat[es], conduct[s], engag[es] in, carr[ies] on a business," and has its principal place of business in Florida; committed tortious acts in Florida as alleged herein; and "is engaged in substantial and not isolated activity within this state."  Fla. Stat. §§ 48.193(1)(a)(1), (2); Fla. Stat. § 48.193(2).

21.     Venue in this Court is proper because "a substantial part of the events . . . giving rise to [Plaintiffs'] claims occurred" in this district.  28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A.     Altor Develops Relevant Cancer-Cure Technology.

22.     The treatment of cancerous tumors has traditionally relied heavily upon chemotherapy administered at the maximum dose that a patient can tolerate.  But high levels of chemotherapy often have unpleasant side effects and can result in an increase in senescent cells and senescence-related pathways.  Senescent cells are cells that stop multiplying, but do not die as intended.  They instead remain in circulation and continue to release chemicals that can trigger inflammation, or the body's natural protective response to stimuli.  An increase in inflammation in the localized tumor environment can eventually result in cancer relapse.  Inflammation caused by senescent cells can also worsen cancer side effects elsewhere in the body.

23.     Therefore, there is a need for a multifaceted molecular approach to cancer treatment—an approach that (1) stimulates the body's own ability to fight the cancer itself; (2) overcomes other factors that suppress the body's ability to fight the cancer; and (3) reduces the inflammation and side effects that can result from treatment.  Since its inception in 2002, Altor has invested in the research and development of molecules for the treatment of cancer and inflammatory, immune, and autoimmune disorders following this holistic approach—focusing on

6

"immunostimulation," countering "immunosuppression," and treating the secondary effects related to the disease, such as inflammation.  These molecules include interleukins, tissue factor, and transcription growth factor receptor.

24.     Interleukins ("IL") are cancer antagonists that can accomplish the first and second goals.  As to the first goal, they stimulate the body's immune cells, which in turn attack cancerous cells.  Some examples of the interleukins studied by Altor and its parent company NantCell include IL-15, IL-2, IL-12, IL-7, and IL-18.  As to the second goal, interleukins can help overcome other molecules that suppress the body's own immunity.  But despite their anti-tumor potential, naturally occurring interleukins often are unstable and degrade quickly.  Therefore, high doses are required to be effective.  But higher doses can result in increased risk of toxicity and greater danger to the patient.  In order to increase the effectiveness of interleukins while minimizing toxicity, Altor has modified, in unique and proprietary ways, naturally occurring interleukins into derivatives.

25.     Tissue factor ("TF") is a protein receptor found on the cell surface that is primarily known for its role in initiating blood clotting.  TF is a target for cancer cells and is sometimes overexpressed in those cells, promoting cancer activity.  Targeting TF can have therapeutic implications for tumors and treatment of certain cancers.

26.     Certain transcription growth factors ("TGF") (such as TGF-$\beta$) can suppress the body's immune cells from attacking tumors.  TGF-$\beta$ can also increase inflammation and side effects resulting from chemotherapy.  TGF-$\beta$ receptors can capture TGF molecules and prevent them from triggering inflammation.  TGF-$\beta$ receptors have also been modified into derivatives that are more effective at capturing inflammation-triggering TGF molecules than naturally occurring TGF-$\beta$ receptors.  To control the immunosuppression and inflammatory effects of TGF-$\beta$, researchers have investigated how to use both interleukins and TGF-$\beta$ receptors to capture TGF-$\beta$.  Specific interleukins (such as IL-15) have been found to act against TGF-$\beta$'s suppression of immunity cells.

7

**B.**     **Under Dr. Wong's Supervision, Altor Invests Significant Resources to Develop Fusion Protein Complexes Using Interleukins, TGF-β Receptors, and Tissue Factor.**

27.     Historically, biochemists and synthetic chemists have focused on developing molecules that primarily employ the functionality of a single protein or antibody product to do a single job.  However, a more modern approach to drug development—and the one employed at Altor—has turned to the creation of hybrid proteins.  Often referred to as fusion protein complexes, these hybrid proteins are created using novel and propriety combinations of different protein components, joining them together into a single molecular structure.

28.     A fusion protein complex can have distinct advantages over individual proteins.  For example, a fusion protein complex can have multiple functions derived from its combination of different proteins.  Or, a fusion protein complex can have entirely new functions that arise from the way its combined proteins interact with each other.

29.     Altor was an early-stage biopharmaceutical company formed in 2002 by Dr. Wong.  For over 15 years after it was founded, Altor worked to develop fusion protein complexes that affect immune responses.  Altor invested significant resources to develop the foundational technology underlying these fusion protein complexes, to synthesize and test molecules using that technology, and to design and implement protocols and processes to purify, assay, and optimize the manufacture of those molecules.

30.     One of the earliest areas of research at Altor involved the design of a molecular "linker" that joins together different components within a fusion protein complex.  To that end, by May 2007, Altor scientists conceived and developed a protein scaffold-technology platform referred to as the "TxM Program."  The TxM platform would later serve as the linker that brings together specific combinations of interleukins, TGF-β receptor, and/or tissue factor.

31.     Using this platform, Altor worked to develop molecules that would both stimulate the body's own ability to fight cancer and overcome other molecules that suppress the body's ability to fight cancer.  In that effort, by August 2008, Altor scientists developed novel and proprietary fusion protein complexes that use both naturally occurring and modified interleukins

and interleukin receptors.  These modified interleukins and interleukin receptors were retained in the organs longer, and had increased biological activity compared to their naturally occurring counterparts.

32.      Altor (in collaboration with NantCell) also developed modified TGF-β receptors to capture TGF-β, known as the "TGF-β trap."  Specifically, by 2017, Altor discovered that modified TGF-β receptors are more effective than naturally occurring TGF-β receptors because they are more precise in capturing TGF-β.  This results in a reduction of inflammation, and suppression of immunity cells and side effects.  Dr. Wong admits that the specific construct of the TGF-β trap is proprietary to Altor.  For instance, on November 9, 2017, Mr. Hans Klingemann, the vice president of research and development at NantKwest, Inc., wrote to Dr. Wong stating the following: "John Lee mentioned that you have kindly agreed to provide us with your TGF-beta trap so we can put it in our NK cells."  In response on the same day, Dr. Wong wrote "[s]ince NantKwest and NantCell/Altor are two different entities, we need to have a formal MTA [Material Transfer Agreement] to this matter.  This is particular[ly] sensitive because *the TGF-beta trap is proprietary*.  In addition, there are *quite a bit of knowhow involved*." (emphasis added).  Based on Plaintiffs' current investigation, portions of that proprietary know-how were not public knowledge until Altor's publication of its TGF-β construct in January 2, 2020, when US Application No. 2020/0002425A1, which later issued as US Patent No. 11,168,138 ("the '138 patent"), was published.

33.      Another critical part of Altor's research involved tissue factor.  By 2008, Altor was already testing different fusion protein molecules that use tissue factor as a component.  Altor's research demonstrated that tissue factor plays a role in various diseases, including cancer, autoimmune, and inflammatory diseases.  This work continued in February 2018, weeks before Dr. Wong gave up his CEO title.  During that time, Dr. Wong had put together a focus research group devoted to studying tissue factor (the "tissue factor program").  Dr. Wong directed the group to look at how "senescent cells express tissue factor," finding that "[i]t is very interesting and highly relevant to our aging work," and hypothesized that one would observe "tissue factor

9

up regulation in chemo-induced cancer senescent cells."  Building on its body of research, Altor developed fusion molecule complexes that combined tissue factor with specific interleukins, such as IL-15.  On information and belief, Dr. Wong, while still employed at Altor as an employee and/or thereafter as a consultant, had also developed—but concealed—the idea of using tissue factor as a "linker" to connect interleukins and TGF-β receptor in a fusion protein complex.

34.     Over the years, Dr. Wong led the effort at Altor to develop a library of novel molecules using these concepts that showed promising therapeutic efficacy for the treatment of cancer.  By 2017, this library included molecules that combine IL-12 with IL-18, molecules that combine IL-15 and IL-18, molecules that combine all three interleukins (IL-12, IL-15, and IL-18), molecules that combine interleukins with tissue factor, and molecules that combine interleukins with TGF-β receptors to mediate communication among the body's immunity cells to engage in anti-tumor activities.

35.     To construct this library of proprietary molecules and know-how and strategies on further development, Altor painstakingly gathered data on each fusion molecule candidate.  First, Altor scientists amassed an enormous amount of theoretical knowledge on what molecular components should be combined into a fusion protein complex to achieve a therapeutic effect. Altor scientists, led by Dr. Wong during his employment at Altor, studied the chemical and biological functionality of each component (i.e., what the component is capable of binding and interacting with), how the various components can be physically combined together, whether the combined components' respective functionalities would be affected by the combination itself, and how to optimize the fusion molecule for potency and efficacy.

36.     Next, once particular molecules were identified as potential candidates, Altor scientists, again under Dr. Wong's supervision, conducted cloning and expression studies to understand how to physically construct and activate the molecule.  Then, Altor conducted purification, *in vitro*, and *in vivo* experiments to determine whether the molecule would be sufficiently stable and effective in the environment in which it was intended to be active.

37.     For those molecules that showed promise after Altor completed these initial studies of molecule characterization, synthesis, and stability, Altor then worked on process development, which was critical to streamline the manufacture of the candidate molecules and to ensure that they meet the rigorous requirements of quality of control.  The techniques, methods, and protocols, developed by Altor scientists (including Dr. Wong while he was working for Altor) to support this research were confidential and proprietary to Altor and NantCell.  The techniques, methods, and protocols also derived value from being secret, because they provided Plaintiffs with a framework and direction on how to identify additional drug candidates, or ways to develop them.

38.     Experiments like these eventually allowed Altor to establish proof of concept of many of the fusion protein complexes in its extensive library of potential molecules.

39.     By 2015, Altor's research in this area had resulted in several clinically tested compounds, including ALT-801 (which uses IL-2 in the fusion protein complex), ALT-803 (which uses modified IL-15 (IL-15N72D) and modified IL-15 receptor (IL-15RαSu) in the fusion protein complex), and ALT-836 (which uses tissue factor in the fusion protein complex).

40.     By March 2015, Altor was conducting Phase II clinical testing of ALT-836 on solid tumors, studies that were supported by the NIH.  At the time, there was no approved cancer therapy targeting the role and overexpression of tissue factor.  Altor considered ALT-836 a novel and highly promising candidate for cancer therapy.  In clinical trials involving patients with pancreatic cancer, high doses of ALT-836 were well-tolerated, and the median overall survival rate using ALT-836 surpassed that of recently approved drugs.

41.     By October 10, 2016, Altor also demonstrated that ALT-803 was an effective foundation for fusion proteins to enhance the body's immunity cells (referred to as T and NK cells).  Altor discovered that the modifications it made to the IL-15 in ALT-803 made it 30 times more active compared to naturally occurring IL-15, induced immunity cell proliferation, remained active for 25 hours *in vivo* compared to less than 40 minutes for naturally occurring

IL-15, and resulted in longer period of retention in relevant body tissues.  ALT-803 also reversed TGF-β's inhibition of the body's immunity cells, thereby reducing immunosuppression.

42.     Altor regularly worked to improve the compounds it had developed.  For example, even though ALT-803 was successfully synthesized by 2008, Altor continued to develop the compound further and optimize the molecule's construct up through at least 2018, when Dr. Wong departed from Altor as CEO.

43.     As discussed below, Dr. Wong took key elements of this technology and used it at HCW Biologics.

C.     **Plaintiffs Implement Long-Standing Policies and Practices to Protect Their Confidential Information.**

44.     Throughout the years and during the relevant periods, Plaintiffs implemented several different company policies and practices to protect their confidential, proprietary, and trade secret information.

45.     First, Plaintiffs required employees to sign confidentiality agreements, such as the Invention and Confidential Information Agreement Dr. Wong and other employees executed, as described further below.

46.     Second, Plaintiffs required that, in practice, its employees protect and maintain the secrecy of Altor's confidential and proprietary information.  To that end, Plaintiffs expected and to this day still expect their employees to exercise care of such information and, critically, use it only to serve Plaintiffs' interest.

47.     Third, Plaintiffs required that, in practice, their employees obtain permission from a senior manager before sharing any of Plaintiffs' information with any third-party partners. Employees had to follow this practice regardless of whether Plaintiffs maintained a non-disclosure agreement ("NDA") with such partner.

48.     Fourth, as a condition of sharing its confidential, proprietary, and trade secret information with any partner, Plaintiffs required that such partner maintain adequate information system security policies for protecting such information.

12

49.     Nevertheless, despite all these efforts, the valuable and confidential knowledge and information accumulated by Plaintiffs after years of investment, research and testing was stolen by Dr. Wong as he was leaving Altor as a former employee and used for HCW Biologics' benefit.  Dr. Wong, as an employee and consultant, was entrusted by Altor and NantCell to have full access to their confidential know-how, and Dr. Wong abused that trust through his actions detailed below.

**D.     Dr. Wong Agrees to Assign His Rights to Inventions to Altor and to Protect Altor's Proprietary Technology.**

50.     Dr. Wong was Altor's Chief Executive Officer from its 2002 inception until he departed as an employee in March 2018.  From the very beginning, Dr. Wong owed a variety of fiduciary, invention assignment, confidentiality, and other obligations to Altor.

51.     On June 11, 2002, Dr. Wong signed an Invention and Confidential Information Agreement with the company (the "Invention Agreement"), attached as Exhibit 1, in which he agreed that "All inventions, discoveries and improvements related to Altor's business whether patentable or not, . . .which are made or conceived by me either solely or jointly with others during the period of my employment by Altor shall be promptly disclosed in writing to my supervisor and shall be for the benefit of Altor and become and remain its sole and exclusive property."  Invention Agreement §1.  These obligations under the Invention Agreement applied for three years following Dr. Wong's 2018 termination from Altor.  *Id.*

52.     The Invention Agreement also states that Dr. Wong "will not during *or at any time after the termination of [his] employment with Altor* use [himself] or divulge or convey to others any secret or confidential information, knowledge or data of Altor or that of third parties obtained by [Dr. Wong] during the period of [his] employment with Altor such information, knowledge or data to include but is not limited to secret or confidential matters."  Invention Agreement § 2 (emphasis added).

E.     **Dr. Soon-Shiong Invests in Altor and Works with Dr. Wong on Interleukin Factors, Tissue Factor, and TGF-β.**

53.     NantCell's founder, Dr. Patrick Soon-Shiong, is a renowned physician, surgeon, and scientist who has devoted his career to researching, inventing, and pursuing innovative drugs and therapies, including efforts to develop a combination therapy to combat advanced pancreatic, triple-negative breast, lung, and other cancers.  Dr. Soon-Shiong has obtained FDA approval to market more than 50 drugs and has over 500 patents worldwide.  In the 1990s, Dr. Soon-Shiong invented the nation's first nanoparticle chemotherapy drug Abraxane®, now approved by the FDA to treat metastatic breast, lung, and pancreatic cancer.

54.     Based on Dr. Soon-Shiong's clinical work and research, he has theorized that using a targeted combination of an antibody, a human immune cell (termed the T cell or natural killer or "NK" cell), and low-dose chemotherapy will improve patient survival.  He also believed that by using patient DNA and protein sequencing—identifying the amino acid sequences that make up a protein to better understand the protein's function—strategies can be developed that will help determine which patients may be appropriate for a particular treatment or combination of drugs.  These are the foundations of Dr. Soon-Shiong's "combination therapy" for cancer.  Dr. Soon-Shiong created the Nant family of companies to develop these cancer treatments.

55.     Dr. Soon-Shiong was first personally introduced to Dr. Wong in October 2015 by a mutual colleague, Dr. Jeffrey Schlom of the National Cancer Institute.  After learning about Altor's products through multiple meetings with Dr. Wong and presentations from Altor employees to Dr. Soon-Shiong and NantCell employees, Dr. Soon-Shiong expressed his interest in investing in the company.

56.     Dr. Wong saw Dr. Soon-Shiong's interest as an opportunity to eliminate issues Dr. Wong had faced at Altor, including lack of resources at the company and allegations of personal misconduct which had been asserted against him by two members of Altor's Board, Ambassador C. Boyden Gray and Adam Waldman.  Dr. Wong and another Board member arranged for Dr. Soon-Shiong to purchase the Altor shares held by Ambassador Gray, Mr.

14

Waldman, and their associates.  Dr. Soon-Shiong purchased over 22 million Altor shares from these third parties in January 2016, and Ambassador Gray and Mr. Waldman resigned from Altor's Board.

57.     Although Dr. Soon-Shiong's purchase of the dissenting shareholders' stock in January 2016 resolved Altor's Board stalemate, Altor had exhausted nearly all of its funding and still needed additional capital to continue its clinical research and trials of its compounds.  Dr. Soon-Shiong, through his affiliated companies, invested tens of millions of dollars in Altor financing rounds in 2016 and 2017 to provide the company with the cash it needed to sustain operations and to expand its product manufacturing capabilities.

58.     Dr. Soon-Shiong was also appointed Chairman of Altor's Board in April 2016, joining Dr. Wong and Mr. Fred Middleton on the Board.

59.     The combination of NantCell and Altor technology began immediately.  Altor entered into exclusive and confidential co-development agreements with NantKwest, another company affiliated with Dr. Soon-Shiong, in August 2016, and with NantCell in September 2016.

60.     In late 2016, Dr. Soon-Shiong and Dr. Wong began discussing a merger between Altor and NantCell.  As the parties were negotiating the final details of a binding term sheet for the Merger, pursuant to an NDA, Dr. Soon-Shiong visited Altor's facilities in Miramar, Florida, to discuss his vision for combining Altor and NantCell's capabilities to cure cancer.

61.     During Dr. Soon-Shiong's visit to the Altor offices on February 10, 2017, he gave a white-board presentation for Altor scientists, including Dr. Wong.  During this presentation, Dr. Soon-Shiong shared knowledge and information regarding the way TGF-β and several specific interleukins (e.g., IL-12, IL-15, and IL-18) affect tumor development.  Specifically, Dr. Soon-Shiong taught that TGF-β receptor, and IL-12, IL-15, and IL-18 as a combination, can engage in signaling to induce memory-like NK cells for cancer immunotherapy.  This later became the very subject of Dr. Wong's article published in October 2021, attributing the findings to himself and HCW Biologics. *See, infra* at ¶¶115-117.  After the presentation, Dr. Soon-

Shiong continued to provide information, ideas, and direction for Altor's research on fusion proteins, including uses of various interleukins and the TGF-β trap.

F.     **NantCell Merges with Altor, and Dr. Wong Continues as CEO of Both Altor and NantCell, and Later as Consultant.**

62.     Altor and NantCell agreed to a binding merger term sheet on February 18, 2017 and finalized a merger agreement on May 19, 2017.  The Merger closed on July 31, 2017, with Altor becoming a wholly owned subsidiary of NantCell.

63.     As a major investor in Altor and later Chairman of Altor's Board of Directors, Dr. Soon-Shiong had worked closely with Dr. Wong to develop and advance Altor's promising technology.  Following the merger, NantCell and Dr. Soon-Shiong elected to have Dr. Wong stay on as CEO of Altor, and Dr. Soon-Shiong also appointed Dr. Wong CEO of NantCell, trusting him to develop Altor's technology for Altor's and NantCell's benefit.

64.     On May 19, 2017, the same day the merger agreement was signed, Dr. Wong signed another employment agreement with Altor and NantCell (the "Employment Agreement"), which again required him to assign rights to any inventions during his employment at Altor and to maintain the confidentiality of Altor's proprietary information.  The Employment Agreement, attached as Exhibit 2, also prohibited Dr. Wong, while he was an employee of Altor or NantCell, from "engag[ing] in any other activity for compensation, profit or other pecuniary advantage" outside of his work for Altor and NantCell.  Employment Agreement § 2.  The Employment Agreement also prohibited Dr. Wong from "render[ing] or perform[ing] services of a business, professional or commercial nature other than for [Altor], NantCell and their affiliates," or from "establish[ing] or engag[ing] in any business activity that would compete in any way with the current or proposed business of [Altor], NantCell or their affiliates."  *Id.*

65.     The Employment Agreement also required Dr. Wong concurrently to execute Altor's standard Employee Proprietary Information and Assignment Agreement.  *Id.* § 8.

66.     Dr. Wong also agreed to return all property of the company that was furnished to or created or prepared by Dr. Wong during his employment upon termination.  *Id.* at § 6(a).

67.     Dr. Wong continued as CEO of Altor and NantCell following the Merger until March 2018.

**G.      Dr. Wong Plans to Exit Altor and NantCell and Attempts Unsuccessfully to Obtain Permission to Take Altor's Information and Technologies with Him.**

68.     In early 2018, Dr. Wong expressed to Dr. Soon-Shiong his desire to exit Altor and NantCell to run his own company.  Dr. Wong informed Altor and Dr. Soon-Shiong that he was leaving Altor as an employee, but would remain in a consulting role for certain projects.

69.     While he was still CEO of both Altor and NantCell after the merger, and while still working on Altor projects such as the "tissue factor program," Dr. Wong was making plans to start his new company using Altor's technologies.[2]  On February 1, 2018, Dr. Wong presented to Dr. Soon-Shiong—in the form of a draft binding term sheet—a spinout proposal whereby HCW Biologics would purchase technology from Altor, including molecules based on the TxM platform technology, ALT-836 and its derivatives (which use tissue factor), TGF-$\beta$ receptor II, and ALT-801 and its derivatives.

70.     An accompanying spinout presentation directly stated that HCW Biologics' objectives were to continue the development of ALT-836 and ALT-801, as well as other molecules based on the TxM platform.  Dr. Soon-Shiong rejected that proposal.  But this did not deter Dr. Wong.  In a revised proposal on February 10, 2018, Dr. Wong again pushed to transfer to HCW Biologics the know-how on molecules that used certain interleukins, including IL-18 and IL-12.  Dr. Soon-Shiong again refused to agree.  The negotiations surrounding the asset transfer agreement ultimately went nowhere, and the proposed arrangement was never executed.

71.     As these negotiations confirm, Dr. Wong knew that there was no ambiguity about the fact that he was not allowed to take any of Altor's technology with him for HCW Biologics and his own benefit, much less to compete with Altor and NantCell.

---

[2]  In fact, Dr. Wong had first registered his planned new company as a Florida LLC, HCW Biologics LLC, as early as November 7, 2017.  He then later incorporated the company in Delaware.

**H.**     **Dr. Wong's Separation and Consulting Agreements Confirm His Obligations to Altor.**

72.     In connection with his departure from Altor and NantCell, Dr. Wong signed a separation agreement (the "Separation Agreement"), attached as Exhibit 3, on March 20, 2018. Under the Separation Agreement, Altor agreed to pay Dr. Wong his annual salary of $480,000 for eighteen months following his departure, through September 30, 2019, or a total of $720,000. Separation Agreement at § 2.  The Separation Agreement also specified that all of Dr. Wong's confidentiality obligations under Section 6 of the Employment Agreement would continue in full force and effect, including Dr. Wong's obligations to return any property to Altor.  Separation Agreement § 3(a).

73.     To minimize disruption from Dr. Wong's exit from Altor, Dr. Wong and Altor also agreed to a consulting agreement (the "Consulting Agreement"), attached as Exhibit 4, on April 1, 2018.  Under the Consulting Agreement, Dr. Wong would continue to provide assistance and general advice to Altor, including technical and scientific support for ALT-803.  Consulting Agreement at § 1, Ex. A.  Under the Consulting Agreement, Altor agreed to pay Dr. Wong $12,000 per quarter for two years, or a total of $96,000, through March 21, 2020.

74.     Altor complied with and paid Dr. Wong the above-stated compensation under the Separation Agreement and Consulting Agreement.

75.     Recognizing that Dr. Wong had and would continue to have access to much of Altor's confidential information by way of his ongoing consulting role and Dr. Wong's desire to have HCW Biologics be near Altor's Florida facilities, the Consulting Agreement again prohibited Dr. Wong's use of Altor's protected proprietary information, broadly defined to include, without limitation, any "information, ideas, or materials of a technical or creative nature, . . . and *concepts relating to [Altor's] products, services, processes, technology or other intellectual property rights*."  Consulting Agreement at § 4(a) (emphasis added).

76.     In particular, the Consulting Agreement required that Dr. Wong not use Altor or its affiliates' proprietary information except to perform services under the Consulting Agreement

or for the benefit of Altor.  *Id.* at § 4.  Dr. Wong agreed that he would "hold all Proprietary Information in strict confidence and trust for the benefit of [Altor]," would "not copy or use . . . any Proprietary Information, except as may be necessary to perform the Services" and would "use the Proprietary Information only for the benefit of [Altor] (and not for the benefit of [Dr. Wong] or any third party."  *Id.* at § 4(b).  The Consulting Agreement stated that "[a]ll Proprietary Information is and shall remain the sole property of [Altor]."  *Id.*

77.     The Consulting Agreement also expressly stated that Dr. Wong assigned to Altor all right, title, and interest in or inventions related to ALT-803 and the TxM platform—which Dr. Wong had previously asked Dr. Soon-Shiong to allow him to acquire or license so he could use it at HCW Biologics.  *Id.* at § 5.

78.     On April 2, 2018—the day after Dr. Wong signed the Consulting Agreement with Altor—Dr. Wong arranged for HCW Biologics, Inc. (the company he had started as an LLC earlier) to register as a Delaware corporation.  HCW Biologics, LLC was formally dissolved later that year, on September 28, 2018.

79.     Dr. Wong left his Altor employment in 2018 without the legal rights to the technology he was seeking to acquire for HCW Biologics, and in fact *without the rights to any Altor technology*.  Nonetheless, Dr. Wong decided to take it for himself anyway and use that technology for HCW Biologics' benefit, fully aware that it was against the law and his contractual duties.

**I.**     **Altor Relies on Dr. Wong's Misrepresentations About HCW Biologics' Research Focus.**

80.     During the negotiations surrounding his separation, Dr. Wong committed not to compete with Altor and NantCell.

81.     For example, during the spin-out discussions, he emphasized that any assets spun off from Altor or NantCell under Dr. Wong's or HCW Biologics' control "will not be developed and commercialized for cancer therapies" (original emphasis).

82.     Then, during the negotiations of the Separation Agreement, Dr. Wong assured Altor that his future work at HCW Biologics would be limited to anti-aging research and would not compete with Altor's business.

83.     Altor relied upon these assurances, which were ultimately proven false, and agreed to § 3(b) in Dr. Wong's Separation Agreement.

84.     Provision § 3(b) permitted Dr. Wong to solicit certain Altor scientists to join him at HCW Biologics (Exhibit A to the Separation Agreement).   Thereafter, Dr. Wong convinced several Altor scientists to join him at HCW Biologics, which likely contributed to the rapid and thorough appropriation and implementation of proprietary information from Altor.

**J.     Dr. Wong and HCW Biologics Secretly Steal and Use Altor's and NantCell's Confidential Information, Inventions, and Opportunities.**

85.     As detailed below, Plaintiffs only recently discovered that in the months and weeks before his departure from Altor as CEO, Dr. Wong began collecting and unlawfully removing confidential data and information related to Altor's proprietary projects and molecules off Altor computers through removable devices and email, and directing Altor resources to research key concepts, including tissue factor, that now serve as a fundamental component of molecules "developed" later at HCW Biologics.

86.     Indeed, even while he was still an employee of and owed various legal duties and obligations to Altor, it appears that Dr. Wong was already conceiving and designing molecules for cancer treatment that HCW Biologics would later claim to be its own.   For example, as early as September 2017, Dr. Wong sent an email referring to a certain molecule as an "HCW molecule" in correspondence with a subset of Altor employees.

87.     As discussed below, it is also now apparent that after Dr. Wong launched HCW Biologics he and HCW Biologics improperly:

- retained and unlawfully used and accessed Altor confidential research and development documents;

- used Altor's information to develop molecules based on Altor technology;

- filed patent applications claiming Altor's proprietary technology as HCW Biologics' own; and

- capitalized on contacts and connections Dr. Wong had made through Altor to attempt to usurp Altor opportunities to benefit HCW Biologics.

1. **Dr. Wong and HCW Biologics Steal Altor Knowledge on Tissue Factor.**

88.     As the former CEO, Dr. Wong had access to all of Altor's research work.  He was heavily involved in nearly all research and a contributor to publications associated with Altor, including work relating to tissue factor.

89.     By early 2018, Dr. Wong and a small subset of Altor employees initiated a task force specifically on tissue factor, later referred to as the "tissue factor program."  By January 3, 2018, this task force was actively collecting documents from folders relating to ALT-836, the Altor-molecule that incorporates tissue factor in its fusion molecule architecture.  Based on information and belief, this research included an investigation of the role that tissue factor plays in fusion protein molecules, how it can be constructed in a stable manner within a fusion protein molecule, and how it can be combined with interleukins, such as IL-12, IL-18, and IL-15, and with TGF-$\beta$ receptor.

90.     In particular, the exfiltrated documents on Altor's tissue factor program included collected documents and data sorted through from Altor collaborators such as Genentech, confidential details and know-how about the manufacturing of the tissue factor molecule, clinical trial information for cancer treatment using the molecule, and presentations that were specifically used for out-licensing discussions for business development relating to the tissue factor molecule.

91.     And, as reflected in Altor meeting minutes on March 7, 2018, research into the use of tissue factor was ongoing at Altor until Dr. Wong's departure from Altor as CEO.  Just days before Dr. Wong left Altor as an employee, he was directing Altor scientists and resources to investigate fusing tissue factor to a derivative of IL-15 and to Altor-owned cell lines.  On the same day, Dr. Wong also planned for future research to focus on tissue factor and recommended

to "include [tissue factor] in future studies" and that Niraj, an Altor employee, "will include [tissue factor] in future flow."

92.     Dr. Wong's ideas and this research was confidential to Altor and not to be disclosed to the public or taken by Dr. Wong for his or HCW Biologics' own use.  But, on information and belief, Dr. Wong and HCW Biologics did exactly that.

93.     For example, on March 18, 2018, two days before executing his Separation Agreement from Altor, Dr. Wong created and/or downloaded an entire folder of tissue factor information and papers using Altor company resources.  These documents reflected the company's strategy and thoughts on how tissue factor plays a role in cancer and cell senescence, which, as discussed below became a critical part of HCW Biologics molecules that Dr. Wong subsequently developed.  Having and benefitting from these learnings provided HCW Biologics an unlawful head-start that it would not have otherwise had but for HCW Biologics' and Dr. Wong's improper conduct.

94.     Further discovery will show that Dr. Wong used this information in the construction of molecules attributed to HCW Biologics.

     **2.**      **<u>Dr. Wong and HCW Biologics Move Other Altor Confidential Information onto Removable Storage Units.</u>**

95.     Altor's recent investigation has revealed that by February 2018, Dr. Wong, for his and HCW Biologics' benefit, was accessing and moving key documents relating to Altor's research on the synthesis and testing of fusion protein complexes to removable storage units, rather than use the computer workstation provided to him by Altor to review or access these materials.  On information and belief, Dr. Wong took these removable storage units when he left his Altor employment and used them for the benefit of HCW Biologics.

96.     During the critical early 2018 period, while Dr. Wong was planning his illicit scheme, forensic investigation has recently revealed that he surreptitiously connected a large number of USB devices, including external hard drives, to his computer:

- January 23, 2018, 8:49: Western Digital 3200BEV External USB Device

- February 9, 2018, 10:03: SanDisk Cruzer USB Drive

- February 27, 2018, 17:05: Western Digital easystore 25FC USB Device

- March 2, 2018, 14:33: SanDisk Extreme Pro USB Device

- March 20, 2018 [*date of separation agreement & general release*], 18:32:
  SanDisk Cruzer Glide USB Device

97.     Based on Plaintiffs' current investigation, none of these devices were returned to
Plaintiffs.  Dr. Wong's connection of five *different* external USB devices to his company
computer, including on the date of his separation from NantCell, is highly unusual and
suspicious.  According to forensic analysis of the computer, at no time had Dr. Wong connected
USB devices to his work computer with such frequency over such a short period of date, even
going back to 2011.  Earlier this year, Dr. Wong and his counsel were put on notice of Dr.
Wong's retention of these devices, but as of the date of this complaint, the devices have not been
returned to Plaintiffs.

98.     Plaintiffs' investigation has revealed that Dr. Wong was accessing and moving
key documents relating to Altor's research onto these removable storage devices.  For example,
on February 26, 2018, before his departure as CEO but after his unsuccessful discussions to spin
out technologies from Altor, Dr. Wong created an "HCW Biologics" folder on a removable
drive.  On information and belief, this folder contains documents that planned for the launch of
HCW Biologics, which may include data, figures, experiments, protocols, prospective investors
and grant opportunities, test results, correspondence, and other Altor proprietary information.
Throughout February 2018, Dr. Wong was also collecting Altor information provided to him by
Altor and/or Dr.  Soon-Shiong and others in a folder on a removable drive named "J:\PSS".

99.     Forensic evidence also indicates that on February 27, 2018, Dr. Wong created or
accessed a PowerPoint with file name "TxM molecules overview.pptx" and stored it on a
removable drive.  This document consists of a library of Altor's internal development molecular
models, including different fusion molecules and their respective testing, data, and findings.

23

100.     On February 27, 2018, Dr. Wong also accessed company presentations that relate to tissue factor research and stored them on a removable drive.  On information and belief, these presentations contain teachings on tissue factor and its role in cancer and senescent cells, and how tissue factor can potentially be incorporated into fusion proteins.

101.     Discovery will provide support for this and additional evidence of Dr. Wong's and HCW Biologics' access of Altor information, attachment of that information to removable storage units, and failure to return that information to Altor after Dr. Wong's departure as CEO.

    **3.**     **Dr. Wong Misappropriates Altor Assays, Protocols, and Procedures.**

102.     As discussed above, Altor scientists, including Dr. Wong as an employee and consultant at Altor, developed a number of processes to, among other things, synthesize, purify, and evaluate the characteristics, stability, and efficacy of its molecules.  Altor expended significant resources to refine the steps for these processes, to keep them secret, and to provide itself potential advantages over competitors in the same industry.

103.     Based on information and belief, Dr. Wong used these processes to jump-start the development of molecules attributed to HCW Biologics, including HCW9218 and HCW9201. Specifically, discovery will show that for HCW9218, HCW Biologics and Dr. Wong were able to combine TGF-β receptor II, tissue factor, and IL-15 derivatives into a stable, isolatable, and effective fusion protein complex by using the protocols Altor developed.  Similarly, discovery will show that for HCW9201, HCW Biologics and Dr. Wong were able to combine tissue factor, IL-12, IL-15, and IL-18 (and their derivatives) into a stable, isolatable, and effective fusion protein complex also by using protocols and assays Altor developed.

**4.      Dr. Wong Files Data-Heavy Patent Applications Less Than a Year After His Departure Using Altor Data and Technology, Confirming His Failure to Disclose and Assign Inventions to Altor.**

104.    Using all of this stolen information, Dr. Wong and HCW Biologics were able to quickly file patent applications claiming Altor technology as their own.

105.    While Dr. Wong worked as an employee and consultant at Altor, Altor researched and tested modified interleukin receptors (such as IL-15RαSu) and a variety of different interleukins (e.g., IL-2, IL-7, IL-12, IL-15, and IL-18), to understand how these molecules play a role in immunostimulation by enhancing the body's immunity cells.  During this time, Altor also was experimenting with different fusion protein complexes using TGF-β receptors to capture TGF-β in order to decrease its suppression of immunity cells.  The use of these proteins in the context of a protein fusion complex was discussed and tested for years while Dr. Wong was an employee and subsequently a consultant at Altor.  Dr. Wong supervised Altor scientists on projects to make fusion protein complexes with IL-15 derivatives, IL-18, and TGF-β receptor II as recently as late February 2018, just a month before he left Altor as an employee.

106.    While Dr. Wong worked at Altor, he also supervised and directed projects specifically to study tissue factor, including how tissue factor can be constructed into a fusion protein complex with other components, and how tissue factor plays a role in cancer therapy. For example, in early 2018, Dr. Wong was instructing scientists at Altor to run experiments using tissue factor, explaining that "[tissue factor] is likely a good target" and that "most epithelial cancer stem cells up-regulate [tissue factor]."  On information and belief, the ability to use a tissue factor specifically as a linker between the first and second proteins was also first

considered by Dr. Wong at Altor, yet Dr. Wong failed to disclose and assign this discovery and any inventions to Altor, as required by his employment and consulting contractual obligations.

107.    Because the research on TGF-β receptor, interleukins, tissue factor, and the construction of these components into a fusion protein complex were done at Altor, either directly or under the supervision of Dr. Wong in his capacity as an employee and/or consultant for Altor, the data, knowledge, and ideas relating to that research belong to Altor, and any intellectual property created from that research similarly belong to and should have been assigned to Altor.

108.    But Dr. Wong did not assign those inventions to Altor.  Instead, armed with all of Altor's research, data, and inventions, Dr. Wong and HCW Biologics, just weeks after Dr. Wong left Altor as CEO, filed a flurry of patent applications containing a significant amount of data that would have required years to synthesize starting from scratch.

109.    Unbeknownst to Altor, on August 30, 2018, just five months after Dr. Wong left Altor and NantCell as an employee, but while still an Altor consultant, Dr. Wong and his new company, HCW Biologics, secretly prepared and filed four, and then more, provisional patent applications derived from Altor's technologies.  These provisional patent applications, which were assigned to HCW Biologics and listed Dr. Wong as the sole inventor, included:

- Provisional Patent Application No. 62/724,969, "Multi-Chain Chimeric Polypeptides and Uses Thereof"

- Provisional Patent Application No. 62/725,010, "Multi-Chain Chimeric Polypeptides and Uses Thereof"

- Provisional Patent Application No. 62/725,038, "Single-Chain Chimeric Polypeptides and Uses Thereof"

- Provisional Patent Application No. 62/725,043, "Multi-Chain Chimeric Polypeptides and Uses Thereof"

110.    Each of the provisional applications filed by HCW Biologics and Dr. Wong relate to the use of fusion proteins, the IL-15 family, tissue factor, and/or TGF-β family and rely on data that was generated at Altor, on Altor time, using Altor equipment.

111.    In October of 2018, HCW Biologics and Dr. Wong filed more patent applications involving multiple target-binding proteins and tissue factor:

- Provisional Patent Application No. 62/746,832, "Single-Chain Chimeric Polypeptides and Uses Thereof"

- Provisional Patent Application No. 62/749,007, "Multi-Chain Chimeric Polypeptides and Uses Thereof"

- Provisional Patent Application No. 62/749,506, "Single-Chain Chimeric Polypeptides and Uses Thereof"

112.    Again, these applications are based on Altor technology.  In particular, the '506 application discloses fusion protein complexes that incorporate a number of interleukins, including IL-2, IL-3, IL-7, IL-10, IL-12, IL-15, IL-17, IL-18, and IL-21 and their respective receptors, functionalities that were studied at Altor and NantCell.  The '506 application eventually issued as U.S. Patent No. 11,401,324 ("the '324 patent").

113.    The '324 patent discloses Altor work relating to the use of tissue factor, and naturally occurring and modified interleukins and TGF-β receptors.  It is assigned to HCW Biologics.  For example:

- The '324 patent discloses a fusion protein complex consisting of the same modified IL-15 receptor and TGF-β receptor studied at Altor.

- The specific IL-15 receptor and TGF-β receptor were selected for use in the fusion protein of the '324 patent precisely because of their functionalities that were discovered at Altor.

- The '324 patent also discusses the use of a tissue factor in a fusion protein complex for cancer treatment and teaches the use of tissue factor to kill senescent cancer cells, a concept that was studied extensively at Altor.

- The '324 patent also teaches certain techniques for synthesizing, assaying, and analyzing fusion protein molecules that were developed at Altor.

27

114.    Dr. Wong and HCW Biologics even filed at least one patent application that directly covers the very technology Dr. Wong attempted (but failed) to obtain in his spin-out proposal—the TxM platform technology.  For example, WO2020047299A1 ("WO '299"), which claims priority to a patent application filed by Dr. Wong in October 30, 2018, discloses:

- The core TxM platform technology developed at Altor (the structural foundation that allows multiple components of a fusion molecule to be fused together); and

- The use of tissue factor in conjunction with the TxM platform.  *See, e.g.,* WO '299 at FIG. 54.

115.    Then, between March and August 2019, Dr. Wong and HCW Biologics filed five more provisional patent applications, which claim several interleukins incorporated into the fusion protein complex, including IL-2, IL-7, IL-12, IL-15, IL-17, and IL-18, tissue factor, and TGF-β factors and receptors, all of which were studied at Altor and explained by Dr. Soon-Shiong in the February 2017 presentation.  *See* Provisional Patent Application Nos. 62/817,230; 62/817,241; 62/817,244; 62/881,039; and 62/881,088.

116.    All of these fourteen provisional patent applications filed by HCW Biologics and Dr. Wong between August 2018 and August 2019 (the "HCW Biologics Provisional Applications") were covered by Dr. Wong's various invention assignment and confidentiality agreements with Altor.

117.    Given the nature of Dr. Wong's research and the speed in which these applications were filed by HCW Biologics after Dr. Wong's departure as Altor CEO, it is clear that the inventions claimed and/or underlying data used were generated while Dr. Wong was an employee or a consultant for Altor, using Altor company property.

118.    Discovery will show whether Dr. Wong is the rightful, sole named inventor of the HCW Provisional Applications, or whether, to the extent the HCW Biologics Provisional

Applications and their family members are not invalid and/or unenforceable, whether others should be named inventors.  In either case, the HCW Biologics Provisional Applications must all be assigned to Plaintiffs.

### 5.     Dr. Wong Derives Fusion Protein Complex HCW9218 from Research Done at Altor.

119.    As discussed above, Altor had expended significant resources to develop fusion molecules that combined specific interleukins with TGF-β receptors and tissue factor.

120.    For example, below are three molecules that Altor developed and tested.  These molecules each incorporate tissue factor ("TF"), IL-15 derivatives ("IL-15RαSu" and "IL-15N72D"), and TGF-β receptor II ("TGF-βRII") into a fusion protein complex:



121.    These molecules attach different targeting domains (tissue factor, TGF-βRII) to the ALT-803 scaffold, which uses IL-15RαSu and IL-15N72D in a fusion protein complex.  Based on information and belief, Dr. Wong stole, and HCW Biologics unlawfully used, Altor information on how specifically to optimize the ALT-803 construct to enhance its expression and efficacy, which included unpublished research that was being done up to the time he departed from Altor.  Based on information and belief, Dr. Wong also stole Altor information on how to fuse tissue factor and TGF-βRII to the construct to form a stable and efficacious fusion protein complex.

29

122.    Indeed, these molecules are similar to molecules HCW Biologics falsely claims to have invented and own.  For example, in an October 2021 article, Dr. Wong, on behalf of HCW Biologics, published an article titled, "Bifunctional TGF-β trap/IL-15 Protein Complex Elicits Potent NK Cell and CD8[+] T Cell Immunity Against Solid Tumors."[3]

123.    This publication featured the molecule identified as HCW9218, a heterodimeric bifunctional fusion molecule that had two protein complexes connected by the tissue factor for the treatment of cancer.  As shown below, one side of the complex includes the TGF-β receptor II.  The other side of the complex includes IL-15 and a modified IL-15 receptor, IL-15RαSu:



124.    On November 7, 2022, HCW Biologics issued a press release announcing that it had "opened three clinical sites for [its] second clinical trial to evaluate HCW9218 in patients with advanced pancreatic cancer."  The press release disclosed that HCW Biologics had submitted for publication preliminary clinical results from its Phase 1 clinical study of

---

[3]    Liu, Bai et al., "Bifunctional TGF-β trap/IL-15 protein complex elicits potent NK cell and CD8[+] T cell immunity against solid tumors," *Molecular therapy : the journal of the American Society of Gene Therapy*, vol. 29:10 (2021): 2949-2962, *available at* doi:10.1016/j.ymthe.2021.06.001.

HCW9218 in solid tumors.  During the Society for Immunotherapy of Cancer conference held in Boston from November 8-12, 2022, HCW Biologics presented its Phase 1 clinical study in a poster titled "A Phase I Study of HCW9218, a Bifunctional TGF-β Antagonist/IL-15 Protein Complex, in Advanced Solid Tumors."  The poster presented data from the first in-human clinical trial and concluded that HCW9218 "safely and robustly expands NK cells after a single dose," and that additional dose escalation studies will follow.

125.    On information and belief, Dr. Wong misappropriated and used Altor's confidential library of candidate molecules and fashioned HCW9218 from that information, as shown below:



126.    HCW9218 is a patchwork of proprietary Altor molecules that Dr. Wong was able to construct quickly because Altor confidential research and know-how showed how to successfully combine TGF-β receptor II with IL-15RαSu and how to combine tissue factor with IL-15 derivatives in fusion protein complexes.

127.    On information and belief, Dr. Wong and HCW Biologics selected the particular components for HCW9218 based on knowledge of their functionalities derived from proprietary work done at Altor, including studies done to understand how tissue factor affects senescent cells, how IL-15 and modified IL-15 receptors stimulate immunity cells, and how modified TGF-β receptors can capture TGF-β to control for its triggering of inflammation and suppression of the immune system.

128.    As Dr. Wong stated in the November 7, 2022 press release, HCW Biologics selected solid tumors for HCW9218's clinical indication because of the molecule's ability to control the immunosuppressive effect of TGF-β using the TGF-β receptor component in its fusion molecule structure.  This functionality of the specific TGF-β receptor II used in HCW9218 was taught by Dr. Soon-Shiong to Dr. Wong while Dr. Wong was employed at Altor.

**6.      HCW Biologics' and Dr. Wong's Claimed HCW9201 Was Based on Research Done at Altor.**

129.    In September 2021, Dr. Wong, on behalf of HCW Biologics, published an article titled "A fusion protein complex that combines IL-12, IL-15, and IL-18 signaling to induce memory-like NK cells for cancer immunotherapy."[4]  A significant portion of this article teaches what Dr. Soon-Shiong had taught during the meeting with Altor on February 10, 2017 about the role of TGF-β receptor in cancer, and how these specific interleukins can be combined into a single fusion protein complex.

---

[4]   Becker-Hapak MK et al. A Fusion Protein Complex that Combines IL-12, IL-15, and IL-18 Signaling to Induce Memory-Like NK Cells for Cancer Immunotherapy. Cancer Immunol Res. 2021 Sep;9(9):1071-1087. doi: 10.1158/2326-6066.CIR-20-1002. Epub 2021 Jul 9. PMID: 34244297; PMCID: PMC8416787.

130.    This publication featured the molecule identified as HCW9201, a heteromeric fusion protein complex of two fusion proteins, one comprising IL-18 and IL-15 linked to tissue factor and another comprising IL-12 linked to the domain of IL-15RαSu, as shown in the figure below:



131.    Like HCW9218, the construction and functionality of HCW9201 molecule shares significant overlap with the molecules studied at Altor, and upon information and belief, was worked on by Dr. Wong while at Altor.  In particular, HCW9201 takes advantage of the knowledge gained from Altor's research on IL-12, IL-18, IL-15, and tissue factor.

132.    For example, below are general overviews of molecules that Altor developed and tested, the details of which are proprietary.  These proprietary Altor molecules taught how to combine IL-12, IL-15, and IL-18 derivatives into a fusion molecules complex.



133.    As shown below, HCW9201 is made up of components of these and other Altor molecules that, as discussed above, each incorporate tissue factor into the fusion protein complex:



134.    Again, on information and belief, Dr. Wong selected these particular components for HCW9201 based on knowledge of their functionalities derived from proprietary work done

34

and know-how developed at Altor, including studies done to understand how tissue factor affects senescent cells, and how IL-12, IL-15, and IL-18 can be used together in concert to stimulate immunity cells.

      **7.**      **Dr. Wong and HCW Biologics Use Altor's Process of Making and Testing Molecules.**

     135.    As part of its work Altor invested significant resources to create and optimize the analytic and manufacturing processes to make the molecules it had developed.  This work included creating proprietary testing, protocols, instructions, acceptance criteria, analytic techniques, and assay procedures to:

- Synthesize the molecule;

- Identify specific characteristics of the molecule;

- Purify the molecule;

- Test for the efficacy, binding, and potency of the molecule to determine therapeutic benefit;

- Calibrate and assess the stability of the molecule to understand whether it will have sufficient longevity to carry out its therapeutic activity in the body;

- Control for the quality and consistency of the molecule.

     136.    Altor conceptualized processes to optimize both upstream and downstream manufacturing processes.  These procedures are critical to maintain equipment and facility integrity, and to prevent contamination of the synthesized product.

     137.    This knowledge, which Altor did not make public, derived value from its secrecy, as it was used for Altor's drug development programs, and was not shared with competitors.

     138.    On information and belief, Dr. Wong took and used these concepts at HCW Biologics as well.

8.      **Dr. Wong Diverts Business Opportunities Away from Altor for the Benefit of Himself and HCW Biologics.**

139.    As the former CEO, Dr. Wong was often the main contact with third party collaborators, including NIH and university scientists.  Therefore, Dr. Wong had direct knowledge of active and potential investors and collaborators of Altor, and leveraged his position of power to usurp those opportunities when he began forming his own company.  Altor's relationship with and contracts with NIH and university scientists were business opportunities that were valuable to Altor, and that as Altor's fiduciary, Dr. Wong had an obligation to support.

140.    However, armed with Altor's confidential technology and know-how, before he left Altor Dr. Wong targeted some of Altor's most valuable contacts in an attempt to use Altor's own proprietary work to usurp Altor's corporate opportunities for the benefit of HCW Biologics.

141.    For example, Dr. Wong secretly misappropriated Altor's relationship and corporate opportunities with Dr. Schlom and the National Cancer Institute.  On February 20, 2018, while Dr. Wong was still Altor's CEO, he emailed Dr. Jeffrey Schlom, a principal investigator at the NIH who had previously collaborated with Altor on several publications relating to the use of tissue factor for cancer treatment.  In that email, Dr. Wong declared that "I have novel regimen to treat cancer" that specifically uses tissue factor and proposed that he and Dr. Schlom privately "discuss these when we meet in Florida," instead of at an upcoming meeting where Dr. Soon-Shiong and other NantCell personnel would be present: "[i]n my opinions, Nant meeting usually is not a good place to discuss collaboration in details due to the distractions."  Dr. Wong did not inform Dr. Soon-Shiong or other NantCell personnel that he and HCW Biologics were secretly meeting with Altor's collaborators regarding projects for their own benefit, while NantCell itself was in discussions with Dr. Schlom on expanding their collaborative research and development efforts.

142.    On March 9, 2018, after the meeting in Florida took place, Dr. Wong again wrote to Dr. Schlom, stating that they "had a productive meeting in Florida," thanked him for his time, and that he "sincerely hope[d] that we could continue our collaboration to promote the research

on the novel molecules."  On information and belief, Dr. Wong was referring to a collaboration on molecules that he would later claim were owned by HCW Biologics.

143.    While still working at Altor, Dr. Wong also began openly encouraging Altor contacts to work with him on prospective projects at HCW Biologics.  For example, he had contacted Dr. Douglas Nixon, a professor and chair at George Washington University in March of 2018 using his Altor email address, pushing for research collaborations with Dr. Nixon specifically on behalf of HCW Biologics.

K.    **HCW Biologics Obtains Investments Based on Altor's Technologies.**

144.    HCW Biologics capitalized immediately on the technology that Dr. Wong stole from Altor, for HCW Biologics' benefit.

145.    Starting in April 2018, with the plan to steal Altor's inventions and confidential information underway and after failing to disclose and assign his inventions conceived of during his employment and consulting to Altor, Dr. Wong invested $5.6 million in HCW Biologics.

146.    In June through October 2019, HCW Biologics received $12.6 million from investors in a private financing round valuing HCW Biologics' shares at $1.05 per share.

147.    In September, October, and November 2020, HCW Biologics obtained another $11.2 million in funding from investors in a private financing round, with shares priced at $2.06 per share.  Dr. Wong was an investor in HCW Biologics in this round.

148.    In October 2020, HCW Biologics received $6.2 million in funding from private investors.

149.    On March 2, 2021, Wugen Inc. ("Wugen"), a biotechnology company that develops cell therapy platforms, announced that it entered into a novel, exclusive license agreement with HCW Biologics "for the use of their proprietary fusion molecules to manufacture Wugen's cellular therapeutics for the treatment of cancer."

150.    The molecule that Wugen licensed from HCW Biologics was HCW9201, which was then developed into the cell product named WU-NK-101.  HCW9201, as discussed above, is based on the research and development work done at Altor, including studies done to understand

the functionality of tissue factor, IL-12, IL-15, IL-18, and derivatives of IL-15 receptors.  Wugen presented preclinical data of WU-NK-101 in solid tumor models.

151.    HCW Biologics' revenues were $1.8 million for the three-month period ending September 30, 2022, and $5.4 million for the nine-month period ending September 30, 2022. HCW Biologics' revenues were derived exclusively from the sale of clinical development material to HCW Biologics' licensee, Wugen.

152.    In July 2021, HCW Biologics made an initial public offering ("IPO") of stock, offering $56 million worth of HCW Biologics stock at $8 per share.  In the November 7, 2022 press release, HCW Biologics announced that it had awarded Dr. Wong an equity award following completion of the IPO.

153.    As of September 30, 2022, HCW Biologics had cash and cash equivalents and investments of $35.9 million.

**L.      Dr. Wong Conceals His Theft of Confidential Information, Making Misstatements to Dr. Soon-Shiong and Others Regarding the Work He and HCW Biologics Were Doing.**

154.    Despite working on technology developed at Altor, Dr. Wong made every attempt to hide—and succeeded in hiding—his misappropriation.

155.    Although he continued to be a consultant to Altor up through 2020, in various messages and conversations with Dr. Soon-Shiong, he misled Dr. Soon-Shiong by denying that he was working on variants or derivations of ALT-803, the TGF-β trap molecules that were developed and conceived at Altor, the tissue factor work that had been conceived of at Altor, or even cancer at all.

156.    For example, Dr. Wong made intentionally false and misleading statements to Dr. Soon-Shiong via text message.  On September 13, 2019, Dr. Wong told Dr. Soon-Shiong that HCW Biologics had been "focusing on anti-aging research."

157.    Later, on June 3, 2020, Dr. Wong again reassured Dr. Soon-Shiong that he was "working on anti-inflammaging with a very unique approach for expansion of human health span

and lifespan."

158.     Dr. Wong also met with Rich Adcock, CEO of ImmunityBio, the parent company of Altor and NantCell, and other employees of ImmunityBio on March 25, 2022 in El Segundo, California.  During this meeting, Dr. Wong presented Mr. Adcock with a slide presentation titled "HCW Biologics' Regulatory T Cell Therapy Platform."  Dr. Wong described HCW Biologics' company focus as concentrated on autoimmune and age-related diseases only.  Mr. Adcock then asked Dr. Wong if HCW Biologics was doing any cancer research or trials.  Dr. Wong said, "No."  Thus, Dr. Wong repeatedly conveyed to Altor and NantCell that his work at HCW Biologics was directed to "anti-aging" and "anti-inflammaging" that specifically did not involve cancer.

159.     Altor found out shortly after Mr. Adcock's meeting with Dr. Wong in El Segundo that Dr. Wong's repeated assurances that he was not competing with his former employers were not true.  On May 19, 2022, the Masonic Cancer Center at the University of Minnesota announced that they opened a new Phase 1 solid tumor cancer clinical trial and treated their first patient with HCW9218, an injectable, bifunctional immunotherapeutic, developed by HCW Biologics.

160.     Then, in a company press release on August 12, HCW Biologics announced that it had received FDA approval to initiate a pancreatic cancer clinical trial, which it was planning to open in the third quarter of 2022.

161.     This press release also made clear for the first time that Dr. Wong had in fact intentionally misled Dr. Soon-Shiong with Dr. Wong's repeated statements that he was doing aging research and therefore not cancer research.  It was only then that further inquiry turned up the patent applications.

## TOLLING OF ANY STATUTES OF LIMITATIONS

## BASED ON FRAUDULENT CONCEALMENT AND AGREEMENT OF THE PARTIES

162.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the wrongful conduct and causes of action alleged herein at the time the wrongful conduct occurred.  HCW Biologics' and Dr. Wong's wrongful conduct, and the true facts underlying the misrepresentations Dr. Wong made, were concealed through a variety of means, including but not limited to Dr. Wong making statements to Dr. Soon-Shiong and Mr. Adcock designed to conceal the truth; Dr. Wong hiding and/or failing to provide Plaintiffs with material documents and evidence; and Dr. Wong failing to abide by various contractual commitments that required timely data transfer, all of which Dr. Wong owed Altor a duty to disclose.  Plaintiffs did not discover the full extent of Dr. Wong's deception and misrepresentations until well within any relevant limitations period, and the discoveries are ongoing.

163.     Plaintiffs, Defendant, and Dr. Wong also agreed to toll any claims any party may have against another party for a period of time.  Plaintiffs can produce the parties' tolling agreement if necessary.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS

### (Florida Uniform Trade Secrets Act)

164.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

165.     This is an action for damages and injunctive relief pursuant to Florida's Uniform Trade Secrets Act, Fla. Stat. §§ 688.001-688.009.

166.     By virtue of his status and position as CEO of Altor and NantCell, as well as his contractual relationships with Plaintiffs, Dr. Wong was entrusted with Plaintiffs' trade secrets.

Those trade secrets derive independent economic value, actual and potential, from not being generally known or readily ascertainable by proper means by Plaintiffs' competitors or other persons or entities who could obtain economic value from its disclosure or use.

167.     Dr. Wong is bound to retain Plaintiffs' Confidential Information in strict confidence and to use it only for business purposes in furtherance of Plaintiffs' interests.

168.     Plaintiffs have made reasonable efforts under the circumstances to maintain the secrecy of their Confidential Information, including, but not limited to, limiting access to sensitive information and requiring employees to sign non-disclosure agreements.

169.     Dr. Wong willfully and maliciously, and without express or implied consent from Plaintiffs, has shared Plaintiffs' Confidential Information with HCW Biologics and threatens to continue to do so in in his continued employment by HCW Biologics.

170.     As a direct and proximate result of the above-described actual and threatened misappropriations of Plaintiffs' trade secrets, Plaintiffs have been damaged, for which they are entitled to compensatory, exemplary, and punitive damages as provided by Fla. Stat. § 688.004, attorneys' fees as provided by Fla. Stat. § 688.005, interest, costs, and any other relief deemed proper by the Court.

171.     Unless restrained, HCW Biologics will continue to retain, misuse, and/or disclose, or threaten to retain, misuse, and/or disclose, Plaintiffs' trade secrets to Plaintiffs' detriment and/or substantial threat of impending injury.  Accordingly, pursuant to Fla. Stat. § 688.003, Plaintiffs are entitled to obtain immediate injunctive relief to enjoin HCW Biologics from its continued actual and threatened misappropriation of Plaintiffs' Confidential Information.

## COUNT II

## MISAPPROPRIATION OF TRADE SECRETS

### (18 U.S.C. § 1836, et seq., "Defend Trade Secrets Act")

172.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

173.     This is an action for damages and injunctive relief pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

174.     By virtue of his status and position as CEO of Altor and NantCell, as well as his contractual relationships with Plaintiffs, Dr. Wong was entrusted with Plaintiffs' trade secrets. Those trade secrets derive independent economic value, actual and potential, from not being generally known or readily ascertainable by proper means by Plaintiffs' competitors or other persons or entities who could obtain economic value from its disclosure or use.

175.     Dr. Wong is bound to retain Plaintiffs' trade secrets in strict confidence and to use it only for business purposes in furtherance of Plaintiffs' interests.

176.     Plaintiffs have made reasonable efforts under the circumstances to maintain the secrecy of their Confidential Information, including, but not limited to, limiting access to sensitive information and requiring employees to sign non-disclosure agreements.

177.     Dr. Wong willfully and maliciously, and without express or implied consent from Plaintiffs, has shared Plaintiffs' trade secrets with HCW Biologics and threatens to continue to do so in in his continued employment by HCW Biologics.

178.     Using Plaintiffs' proprietary technology, HCW Biologics is developing pharmaceutical products intended to be used or sold in interstate or foreign commerce.

179.     As a direct and proximate result of the above-described actual and threatened misappropriations of Plaintiffs' trade secrets, Plaintiffs have been damaged, for which they are entitled to compensatory and exemplary damages, and attorneys' fees as provided by 18 U.S.C. § 1836, interest, costs, and any other relief deemed proper by the Court.

180.     Unless restrained, HCW Biologics will continue to retain, misuse, and/or disclose, or threaten to retain, misuse, and/or disclose, Plaintiffs' trade secrets to Plaintiffs' detriment and/or substantial threat of impending injury.  Accordingly, pursuant to 18 U.S.C. § 1836, Plaintiffs are entitled to obtain immediate injunctive relief to enjoin HCW Biologics from its continued actual and threatened misappropriation of Plaintiffs' Confidential Information.

## COUNT III

## INDUCEMENT OF BREACH OF CONTRACT

181.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

182.    Altor and Dr. Wong formed contracts by entering into the June 11, 2002 Invention Agreement, the May 19, 2017 Employment Agreement, the March 20, 2018 Separation Agreement, and the April 1, 2018 Consulting Agreement.  NantCell is also a party to the Employment Agreement.

183.    Altor has performed its obligations under each of the Invention Agreement, Employment Agreement, Separation Agreement, and Consulting Agreement (collectively, the "Agreements"), and NantCell has performed its obligations under the Employment Agreement.

184.    Dr. Wong is the founder and CEO of HCW Biologics.  On information and belief, HCW Biologics was aware of Dr. Wong's Agreements with Altor and NantCell and his obligations to Plaintiffs under those Agreements.

185.    Section 1 of the Invention Agreement Dr. Wong signed in 2002 states, "All inventions, discoveries and improvements related to Altor's business whether patentable or not, . . . which are made or conceived by me either solely or jointly with others during the period of my employment by Altor shall be promptly disclosed in writing to my supervisor and shall be for the benefit of Altor and become and remain its sole and exclusive property."

186.    Section 2 of the Invention Agreement states that Dr. Wong "will not during or at any time after the termination of [his] employment with Altor use [himself] or divulge or convey to others any secret or confidential information, knowledge or data of Altor or that of third parties obtained by [Dr. Wong] during the period of [his] employment with Altor such information, knowledge or data to include but is not limited to secret or confidential matters."

187.    Dr. Wong breached the Invention Agreement by failing to disclose promptly and in writing to the company developments he was working on during his employment at Altor

using, among other things, Altor's ALT-803, ALT-836, tissue factor, and TxM platform technology, including those technologies for which he filed provisional patent applications less than five months after leaving Altor and NantCell.  Dr. Wong also breached the Invention Agreement by using Altor's confidential and secret information and data to start his own competing company and file the provisional patent applications claiming Altor's technology.

188.    Section 2 of the Employment Agreement prohibits Dr. Wong from "engag[ing] in any other activity for compensation, profit or other pecuniary advantage;" "render[ing] or perform[ing] services of a business, professional or commercial nature other than for [Altor], NantCell and their affiliates;" or "establish[ing] or engag[ing] in any business activity that would compete in any way with the current or proposed business of [Altor], NantCell and their affiliates."

189.    Section 6 of the Employment Agreement states that Dr. Wong, "agrees that all property (including, without limitation, all equipment, tangible proprietary information, documents, records, notes, contracts and computer-generated materials) furnished to or created or prepared by Employee in the course and scope of Employee's employment belongs to the Company and shall be promptly returned to the Company upon termination of Employee's employment."  Dr. Wong also agreed that "until the twelve (12) month anniversary of the termination of employment, [Dr. Wong] will not, directly or indirectly . . . interfere with, damage or impair (or attempt to tortuously interfere with, damage or impair) the relationship between the Company, NantCell and their affiliates and any of their customers, suppliers or business relations (or prospective customers, suppliers or business relations)."

190.    Dr. Wong breached Sections 2 and 6 of the Employment Agreement by establishing his own company, HCW Biologics, LLC and planning to use Altor's technology in his new company while he was still employed as Altor and NantCell's CEO, and later as a consultant, by taking, retaining, and failing to disclose and assign Altor property, including, upon information and belief, documents, records, and notes, and by interfering with and damaging the business relations of the company by applying for patents, conducting research, publishing

44

scientific journal articles, and obtaining private investment for his new company, all using Altor's technology.

191.    Section 3 of the Separation Agreement specified that all of Dr. Wong's obligations under Section 6 of the Employment Agreement would continue in full force and effect, including Dr. Wong's obligations to return any property to Altor.

192.    Section 4 of the Consulting Agreement required that Dr. Wong not use Altor or its affiliates' proprietary information, including any of Altor's information or ideas, or any "concepts relating to [Altor's] products, services, processes, technology or other intellectual property rights," except to perform services under the Consulting Agreement or for the benefit of Altor.  Section 5 of the Consulting Agreement stated that Dr. Wong assigned all right, title, and interest in the TxM platform to Altor.

193.    Dr. Wong breached the Consulting Agreement by taking and using Altor's technology at HCW Biologics, including Altor's ALT-803, ALT-836, tissue factor, and TxM platform technology to which Dr. Wong agreed to assign all right, title and interest to Altor, and by filing patent applications claiming Altor's technology.

194.    Several Altor scientists followed Dr. Wong to HCW Biologics, which likely contributed to HCW Biologics' rapid and thorough appropriation and implementation of proprietary information from Altor.  On information and belief, HCW Biologics induced these former Altor employees to breach their contractual obligations to maintain the confidentiality of Altor's proprietary information that these employees had learned while working at Altor.

195.    As a direct and proximate result of HCW Biologics' inducement of Dr. Wong's breaches of the Agreements, Plaintiffs have suffered and will continue to suffer damages, in an amount to be determined at trial.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

196.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

197.    Upon information and belief, HCW Biologics was aware that Dr. Wong was party to agreements with Plaintiffs that require him to assign all rights, title, and interest to any inventions or discoveries he made during this employment with Altor to the company, and that prohibited Dr. Wong from using any of Altor's confidential information, knowledge, or data for his own use.  Despite knowing the source of the technology HCW Biologics was developing, on information and belief HCW Biologics' board members encouraged Dr. Wong to develop this technology for HCW Biologics, to the company's benefit.

198.    HCW Biologics has interfered with Plaintiffs' rights under its agreements with Dr. Wong and did so knowingly, intentionally, willfully, maliciously, and without justification.

199.    Several Altor scientists also followed Dr. Wong to HCW Biologics, which likely contributed to HCW Biologics' rapid and thorough appropriation and implementation of proprietary information from Altor.  On information and belief, HCW Biologics induced these former Altor employees to breach their contractual obligations to maintain the confidentiality of Altor's proprietary information that these employees had learned while working at Altor.

200.    As a direct and proximate result of HCW Biologics' wanton, willful, malicious, and wrongful actions, Plaintiffs have been and are likely to continue to be damaged and substantially and irreparably injured in their business.

201.    Given the unjustified and egregious nature of HCW Biologics' interference with Plaintiffs' contractual rights with Dr. Wong, Plaintiffs have a substantial likelihood of prevailing on the merits at trial.

202.    HCW Biologics does not have any legitimate, legal, or moral right to act as it has, so as to irreparably harm Plaintiffs.  As such, the balance of equity weighs in Plaintiffs' favor

because the injuries suffered by Plaintiffs outweigh any harm an injunction may impose on HCW Biologics.

203.     Plaintiffs have no adequate remedy at law as the harm inflicted by HCW Biologics is continuing, increasing, and virtually impossible to estimate in terms of economic impact.  For these reasons, damages alone cannot compensate HCW Biologics for the injury caused by HCW Biologics' and Dr. Wong's willful misconduct.

## COUNT V

## INDUCEMENT OF BREACH OF FIDUCIARY DUTY

204.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

205.     Dr. Wong was CEO of Altor from its founding in 2002 through the Merger, and CEO of both Altor and NantCell following the Merger until his departure in March 2018.  As CEO, Dr. Wong had access to Altor's and NantCell's confidential and proprietary information.  As an officer of these companies, he owed fiduciary duties, including a duty of loyalty, to Altor and NantCell.

206.     Dr. Wong is the founder and CEO of HCW Biologics.  HCW Biologics was aware of Dr. Wong's roles as CEO at Altor and NantCell and his fiduciary duties to Altor and NantCell as CEO.

207.     Dr. Wong breached his duty of loyalty to Altor and NantCell by usurping Altor's corporate opportunities for his own personal gain while employed as CEO of both companies, including by starting his own company—while still employed at Altor and NantCell—to compete directly with Altor and NantCell using Altor's own confidential information and technology.  Dr. Wong also unlawfully seized Altor's corporate opportunities by secretly meeting with Altor collaborators in an attempt to gain their support for HCW Biologics in lieu of Altor, disparaging Altor in the process.  Dr. Wong also breached his duty of loyalty by using confidential information acquired during the course of his employment at Altor to directly

compete with Altor and NantCell, and by failing to disclose and assign inventions and other information to Altor that, on information and belief, he was working on while still employed at Altor and NantCell.

208.    Despite knowing the source of the confidential information underlying the technology HCW Biologics was developing, on information and belief HCW Biologics' board members encouraged Dr. Wong to develop this technology for HCW Biologics, to the company's benefit.

209.    As a direct and proximate result of HCW Biologics' inducement of Dr. Wong's breaches of his fiduciary duties, Plaintiffs have suffered and will continue to suffer damages, in an amount to be determined at trial.

**COUNT VI**

**CONVERSION**

210.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

211.    Plaintiffs are, and at all pertinent times were, the owners of proprietary materials and technology, including that relating to the ALT-803, ALT-836, tissue factor, and TxM platform technologies, including laboratory testing results.

212.    Plaintiffs also owned physical USB drives and external hard drives that Dr. Wong used to download confidential and propriety information.  Plaintiffs' forensic investigation has shown that Dr. Wong connected as many as five different USB storage devices to his company computer in the weeks immediately preceding his departure from Altor and NantCell.  Upon information and belief, Dr. Wong took these physical memory storage devices from Plaintiffs to HCW Biologics.

213.    Upon information and belief, after his departure from Altor and NantCell, Dr. Wong improperly retained and converted to his and HCW Biologics' own use tangible materials belonging to Plaintiffs, including physical laboratory testing results relating to Altor's

technology, as were disclosed in Dr. Wong and HCW Biologics' patent applications, and USB and external hard drive storage devices.

214.    As a direct and proximate result of Dr. Wong's conversion of Plaintiffs' property, Plaintiffs have suffered and will continue to suffer damages, in an amount to be determined at trial.

**COUNT VII**

**UNJUST ENRICHMENT**

215.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

216.    Altor conferred a benefit on Dr. Wong by disclosing in confidence to Dr. Wong Altor's materials and technology relating, among other things, to ALT-803, ALT-836, tissue factor, and the TxM platform.

217.    Dr. Wong and HCW Biologics used Altor's confidential materials and technology, including the ALT-803, ALT-836, tissue factor, and TxM platform technology, to approach private investors and solicit funding for Dr. Wong's new company.

218.    HCW Biologics received tens of millions of dollars in financing through these private equity financing rounds, and received $56 million from its initial public offering of stock.

219.    HCW Biologics was unjustly enriched by its wrongful conduct at Plaintiffs' expense.  HCW Biologics knowingly received benefits from Dr. Wong under his Employment Agreement, Separation Agreement, and Consulting Agreement, and through other transactions effected by misrepresentations, and has unjustly retained those benefits.

220.    As a direct and proximate result of HCW Biologics' and Dr. Wong's misconduct, equity and good conscience require that Plaintiffs recover the significant financial benefits that HCW Biologics has obtained through that misconduct in an amount to be determined at trial.

## COUNT VIII

## REPLEVIN

221.     Prior to Dr. Wong's departure from Plaintiffs, Plaintiffs had full ownership and control over its assets, including USB drives and external hard drives that were the physical property of Plaintiffs.

222.     Dr. Wong used USB drives and external hard drives to download documents from his company laptop to those removable storage devices and took those devices with him upon his departure from Altor and NantCell.

223.     Upon information and belief, Dr. Wong and HCW Biologics continue to unlawfully possess these USB removable storage devices and external hard drives that are the property of Plaintiffs.

224.     Earlier this year, Dr. Wong, HCW Biologics, and their respective counsel were put on notice of Dr. Wong's and HCW Biologics' retention of these devices, but as of the date of this complaint, they have not been returned to Plaintiffs.

225.     As a result of HCW Biologic's unlawful possession, HCW Biologics is liable to Plaintiffs in an amount to be determined at trial, and Plaintiffs request that HCW Biologics be ordered to return the USB storage devices and external hard drives that are the rightful property of Plaintiffs.

## COUNT IX

## SPECIFIC PERFORMANCE FOR ASSIGNMENT OF PATENTS AND PATENT APPLICATIONS

226.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

227.     The subject matter claimed in HCW Biologics Provisional Applications, if they are patentable, not invalid and are enforceable, and were invented by the sole named inventor

Hing Wong, were conceived by him while he was employed by or a consultant to Altor, and while he owed continuing invention assignment and other obligations to Altor.

228.    Altor is not currently the assigned owner of the HCW Biologics Provisional Applications or any other domestic or foreign patent applications in the same family (e.g., continuations, divisionals).

229.    To reflect the true and correct ownership of the HCW Biologics Provisional Applications and their family, and to secure Altor's rights therein, Altor should be named as the assigned owner of the HCW Biologics Provisional Applications and any family members, including but not limited to US Patent No. 11,401,324.

## COUNT X

## CONSTRUCTIVE TRUST

230.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

231.    The subject matter claimed in HCW Biologics Provisional Applications, if they are patentable, not invalid and are enforceable, and were invented by the sole named inventor Hing Wong, were conceived by him while he was employed by or a consultant to Altor, and while he owed continuing invention assignment and other obligations to Altor.

232.    Altor is not currently the assigned owner of the HCW Biologics Provisional Applications or any other domestic or foreign patent applications in the same family (e.g., continuations, divisionals).

233.    HCW Biologics has also been unjustly enriched by receiving tens of millions of dollars in financing through private equity financing rounds, and by receiving $56 million from its initial public offering of stock.   HCW Biologics has received these benefits by using Altor's confidential information and technology, by failing to disclose and assign inventions and other information to Altor, and by usurping Altor's corporate opportunities for its own gain, all at Altor's expense.   HCW Biologics knowingly received benefits from Dr. Wong under his

agreements with Plaintiffs, and through other transactions effected by misrepresentations, and has unjustly retained those benefits.

234.     As a direct and proximate result of HCW Biologics' and Dr. Wong's misconduct, equity and good conscience require that Plaintiffs recover the significant financial benefits that HCW Biologics has obtained through that misconduct.

235.     To reflect the true and correct ownership of the HCW Biologics Provisional Applications and their family, and to secure Altor's rights therein, the HCW Biologics Provisional Applications and any family members, to the extent not assigned to Altor, along with any technology improperly retained by HCW Biologics and the financial gains accruing to HCW Biologics' benefit from the unlawful retention of that technology, should be placed in a constructive trust for Altor's benefit.

## PUNITIVE DAMAGES

236.     To the extent the Court finds Defendant's conduct as alleged herein was willful, malicious, and wanton, rising to the level of an evil and reprehensible motive and implying a conscious and deliberate disregard to the interests of others, Plaintiffs seek punitive damages.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be made and entered in its favor and against Defendant as follows:

(a)     An order in Plaintiffs' favor against HCW Biologics on all claims alleged herein;

(b)     An order awarding Plaintiffs general and special damages in an amount to be further proven at trial;

(c)     An order awarding Plaintiffs pre-judgment interest on any monetary relief;

(d)     An order awarding Plaintiffs exemplary and punitive damages against Defendant;

(e)     An order awarding Plaintiffs attorneys' fees and costs;

(f)     An order enjoining HCW Biologics from possessing, accessing, or using any
        Altor confidential, proprietary, or trade secret information, including enjoining
        HCW Biologics' further pursuit of its HCW9218 program;

(g)     An order requiring HCW Biologics to assign title and all rights to the HCW
        Biologics Provisional Applications and any of their patent family members
        (domestic and foreign divisionals, continuations, parent applications) to Altor;

(h)     An order awarding any and all other available damages and such other and further
        relief as the Court deems just and proper.


### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues which may be so tried.

DATED: December 23, 2022                QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                          By */s/ Samuel G. Williamson*
                             Samuel G. Williamson (FL Bar No. 1033817)
                              samwilliamson@quinnemanuel.com
                             **Quinn Emanuel Urquhart & Sullivan, LLP**
                             2601 Bayshore Drive, Suite 1550
                             Miami, FL 33133

                             John B. Quinn (*pro hac vice* to be filed)
                              johnquinn@quinnemanuel.com
                             Harry A. Olivar Jr. (*pro hac vice* to be filed)
                              harryolivar@quinnemanuel.com
                             Jeffrey N. Boozell (*pro hac vice* to be filed)
                              jeffboozell@quinnemanuel.com
                             David M. Elihu (*pro hac vice* to be filed)
                              davidelihu@quinnemanuel.com
                             **Quinn Emanuel Urquhart & Sullivan, LLP**
                             865 South Figueroa Street, 10th Floor
                             Los Angeles, CA 90017

                             Attorneys for Plaintiffs Altor BioScience, LLC
                             and NantCell, Inc.